IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL WILEY | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 24-2237 |
| | : | |
| PATRICK LEE OLSON | : | |

# MEMORANDUM

**MURPHY, J.**                                                                                              **March 28, 2025**

This appeal from the United States Bankruptcy Court for the Eastern District of Pennsylvania concerns the scope of the fraud exception to discharge under 11 U.S.C. § 523(a)(2)(A).  Patrick Lee Olson and Michael Wiley were business partners.  Mr. Olson convinced Mr. Wiley to fund a project supplying technology equipment to an entity called CSS.  When the deal was delayed, Mr. Olson's company issued a promissory note that guaranteed Mr. Wiley his investment outlay and a "premium payment" for anticipated profits.

Unfortunately for Mr. Wiley, the CSS deal was a sham — Mr. Olson had forged CSS's signature on the deal contract.  Things went south for all involved, and both parties eventually filed for bankruptcy.  Mr. Wiley initiated an adversary proceeding in Mr. Olson's Chapter 7 proceedings objecting to the discharge of a default judgment for the amount owed on the promissory note.  The bankruptcy court determined that the portion of the default judgment attributable to the premium payment was excepted from discharge under the fraud exception in § 523(a)(2)(A).  Mr. Olson appeals that decision, as well as the bankruptcy court's refusal to apply judicial estoppel to bar Mr. Wiley's dischargeability claim.  For the reasons that follow, we affirm the bankruptcy court's decision.

I. **BACKGROUND**[1]

   A. **The CSS Deal**

Mr. Wiley (creditor) and Mr. Olson (debtor) had a business relationship involving the procurement and supply of technology products to third parties. DI 4-1 at 4.[2] Mr. Wiley owned a general staffing business, McGrath Staffing, and Mr. Olson operated a business entity called Idea IT Solutions. *Id.* Mr. Wiley, through McGrath, secured and provided capital funding to Mr. Olson and Idea. *Id.* at 4-5. Mr. Olson used this funding to acquire and supply data storage equipment for clients. *Id.* at 5.

In 2017, the parties completed three deals. *Id.* First, McGrath paid Idea $782,370.87 to procure equipment for an entity called CMG. *Id.* Second, McGrath paid Idea $600,000 to acquire equipment for an entity called Synechron. *Id.* at 5-6. Third, McGrath paid Idea[3] $490,000 to procure equipment for an entity called CSS. *Id.* at 6-7. Mr. Wiley testified that he wired an additional $87,000 to Idea on September 29, 2017, resulting in a total outlay of $577,000 for the CSS deal. *Id.* at 7; DI 2-3 at 29.

Mr. Wiley funded the CSS deal with a line of credit from Centric Bank. DI 4-1 at 7. Around September 2017, Centric informed the parties that it required a signed contract for the

---

[1] We derive this background from the factual and procedural history in the bankruptcy court's memorandum opinion, which neither party disputes on appeal. *See* DI 4-1; *In re Olson*, No. 22-00058, 2024 WL 2124911 (Bankr. E.D. Pa. May 10, 2024). We cite to the underlying record when referring to specific testimony or documents.

[2] We adopt the pagination supplied by the CM/ECF docketing system.

[3] Mr. Olson and Mr. Wiley created a new entity, Idea Services, for the CSS deal. DI 4-1 at 6. Mr. Olson served as President and Managing Member of Idea Services. *Id.* The distinction between Idea Solutions and Idea Services is not relevant to our decision, so we refer to both entities as "Idea."

CSS deal to continue providing funds. *Id.* at 8. Mr. Olson presented a contract that was purportedly signed by Mr. Olson, as president of Idea, and Adam Newman, Chief Operating Officer of CSS. *Id.* at 8; *see* DI 2-2 at 30. After Centric received the contract, it released funds for the CSS deal. DI 4-1 at 8.

Mr. Wiley testified that from December 2017 through March 2018, Mr. Olson repeatedly told him that multiple issues were preventing the CSS deal from closing. *Id.*; DI 2-3 at 31. Because of the delay, Mr. Wiley required Idea to execute a promissory note to McGrath in the principal amount of $1,261,000.[4] DI 4-1 at 8-9; *see* DI 2-2 at 32. The promissory note also provided for a "premium payment" of $2,426,000. DI 4-1 at 9; DI 2-2 at 32. Mr. Wiley testified that the premium payment amount constituted the profits promised to him for the CSS deal. DI 4-1 at 9; DI 2-3 at 34. Mr. Olson executed the promissory note on behalf of Idea. DI 4-1 at 9. Pursuant to the note, Idea was to make monthly installment payments of $40,000 to McGrath, in addition to project revenue. *Id.*; DI 2-2 at 32. Idea made only one installment payment. DI 4-1 at 9.

**B. Mr. Wiley's Subsequent Proceedings**

McGrath sued Mr. Olson in Pennsylvania state court to recover the amount owed under the promissory note. *Id.* Mr. Olson failed to answer the complaint, and the court entered a default judgment against him in the amount of $3,678,122.58. *Id.* at 10; DI 2-2 at 38.[5] To

---

[4] The principal amount reflected Mr. Wiley's payments that were to be used for the CSS deal, including the value of equipment left over from the Synechron deal that was to be used for the CSS deal and the additional $577,000. DI 4-1 at 9; DI 2-2 at 32.

[5] The default judgment reflected the amount outlaid by McGrath for the CSS deal, as well as the premium payment, interest, court costs, and attorney's fees. DI 4-1 at 10 n.15; DI 2-2 at 42.

execute the default judgment, Mr. Wiley took discovery from Mr. Olson's bank, BB&T.  DI 4-1 at 10.  Through this discovery, he learned that Mr. Olson had forged the CSS contract.  *Id.*  In February 2022, Mr. Olson was convicted of criminal forgery in Pennsylvania state court.  *Id.*  Mr. Olson testified in the bankruptcy proceeding that he forged the CSS contract because he "wanted to keep [the CSS deal] moving while [he] was trying to do other things."  *Id.* at 11; DI 2-3 at 77.

Due to the collapsed 2017 deals, McGrath filed for Chapter 11 bankruptcy in August 2020.  DI 4-1 at 11.  The Chapter 11 petition was voluntarily dismissed, and Mr. Wiley and his wife filed for Chapter 7 bankruptcy.  *Id.*  The proposed plan for the McGrath bankruptcy listed approximately $10,813 in assets and $5.9 million in liabilities.  *Id.*; DI 2-2 at 59.  In his personal bankruptcy, Mr. Wiley listed the value of his 100% ownership in McGrath as $1.00 and exempted his interest in the company in his amended Schedule C.  DI 4-1 at 11.  According to Mr. Wiley, Centric had deemed the default judgment uncollectible.  *Id.* at 12; DI 2-3 at 64.  Mr. Wiley and his wife received a discharge in their personal bankruptcy proceeding on November 19, 2020.  DI 4-1 at 11.  Mr. Wiley, through McGrath, assigned the default judgment to himself in November 2021.  *Id.* at 12.

C. The Bankruptcy Court Decision and Mr. Olson's Appeal

Mr. Olson filed for Chapter 7 bankruptcy on June 15, 2022.  DI 4 at 8.  Mr. Wiley then filed this adversary proceeding objecting to discharge of the default judgment pursuant to the fraud exceptions for discharge under 11 U.S.C. §§ 523(a)(2) and (a)(4).  *See* DI 2-1.

After a bench trial, the bankruptcy court determined, *inter alia*, that judicial estoppel did not bar Mr. Wiley's nondischargeability action, and the portions of the default judgment attributable to McGrath's outstanding CSS payment of $577,000 and the premium payment of

4

$2,426,000 were excepted from discharge under § 523(a)(2)(A). DI 4-1 at 2, 22-26. The bankruptcy court explained that *Cohen v. De La Cruz*, 523 U.S. 213 (1998) directly controlled the question of whether the premium payment was dischargeable as arising from fraud. *Id.* at 23-24. Under *Cohen*, the premium payment was nondischargeable as a debt arising from the money that Mr. Wiley obtained by fraud. *Id.* at 24-25.

Mr. Olson asserts two errors on appeal. First, he argues that the bankruptcy court erred by refusing to apply judicial estoppel to Mr. Wiley's claim. DI 4 at 7. Second, he argues that the bankruptcy court erroneously relied on *Cohen* to construe the premium payment as nondischargeable punitive damages. *Id.* Mr. Olson does not contest the bankruptcy court's determination that the $577,000 CSS payment was nondischargeable. *Id.* at 9.

## II.   STANDARD OF REVIEW

We have jurisdiction over this appeal under 28 U.S.C. § 158(a). The vantage point of the district court when reviewing a decision of the bankruptcy court is identical to that of a court of appeals. *See In re BH & P Inc.*, 949 F.2d 1300, 1305-06 (3d Cir. 1991). We review the bankruptcy court's factual findings for clear error and legal questions *de novo*. *In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994); *In re Fegeley*, 118 F.3d 979, 982 (3d Cir. 1997).

A court's application of judicial estoppel is reviewed for abuse of discretion.[6] *In re Kane*, 628 F.3d 631, 636 (3d Cir. 2010); *see New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). "[A] court abuses its discretion when its ruling is founded on an error of law or a

---

[6] Mr. Olson argues that judicial estoppel presents a "squarely legal issue[]" requiring plenary review. DI 6 at 7. The Third Circuit has made clear, however, that judicial estoppel is an equitable remedy over which courts have discretion. *In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010).

5

misapplication of law to the facts." *Montrose Med. Grp. Participating Sav. Plan v. Bulgar*, 243 F.3d 773, 780 (3d Cir. 2001) (internal quotations omitted).

## III. DISCUSSION

The questions on appeal are whether the bankruptcy court erred by (1) refusing to apply judicial estoppel and (2) holding that the portion of the default judgment attributable to the premium payment was nondischargeable. We answer both questions in the negative and affirm the bankruptcy court's decision.

### A. Judicial Estoppel

"Judicial estoppel is a fact-specific, equitable doctrine, applied at courts' discretion." *Kane*, 628 F.3d at 638. It "seeks to prevent a litigant from asserting a position inconsistent with one that [he] has previously asserted in the same or in a previous proceeding." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). Its goal is not to eliminate all inconsistencies; rather, it targets those litigants "playing 'fast and loose with the courts.'" *Id.* (quoting *Scarano v. Cent. R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953)).

To apply judicial estoppel, three criteria must be met: First; "the party to be estopped must have taken two positions that are *irreconcilably inconsistent*"; second, the party must have "changed his . . . position in bad faith — i.e., with intent to play fast and loose with the courts"; and third, judicial estoppel must be "tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Montrose*, 243 F.3d at 779-80 (internal quotations omitted).

Mr. Olson argues that Mr. Wiley should be estopped from recovering the value of the default judgment in this adversary proceeding because Mr. Wiley previously valued his interest in McGrath at $1.00 in his own Chapter 7 proceedings. DI 4 at 26-27. According to Mr. Olson,

6

this adversary action allows Mr. Wiley to "unfairly profit[]" at the expense of his creditors, including Centric Bank. *Id.* at 28. Mr. Wiley responds that his $1.00 valuation reflected the value of McGrath's assets less its "significant liabilities," as well as the fact that the default judgment was perceived to be uncollectible. DI 5 at 18. The bankruptcy court refused to apply judicial estoppel. DI 4-1 at 19. It "disagree[d]" with Mr. Olson's contention that Mr. Wiley had taken inconsistent positions, reasoning that Mr. Wiley could seek a nondischargeability determination even if he believes that the judgment is ultimately not collectible. DI 4-1 at 19.

At the bench trial, Mr. Wiley testified that McGrath had $5.9 million in liabilities and approximately $10,813 in assets when he filed for Chapter 11. DI 2-3 at 46-47. He testified that even if he had deemed the full default judgment collectible, the valuation of McGrath would still be "in the negative of millions of dollars." *Id.* at 48. Mr. Olson asserts that Mr. Wiley's decision to "drastically undervalue[]" his assets in the Chapter 7 case allowed him to profit at Centric's expense. DI 4 at 27-28. But Mr. Wiley repeatedly testified that Centric had deemed the default judgment not worth pursuing. DI 2-3 at 47, 64. He also testified that he still doubts whether the default judgment is collectible. *Id.* at 47-48, 53.

We defer to the bankruptcy court's determination that Mr. Wiley's testimony on these points was credible. *See* DI 4-1 at 19. Therefore, we see no error in the bankruptcy court's conclusion that Mr. Wiley had "legitimate grounds" to value his interest in McGrath at $1.00.[7]

---

[7] To the extent the bankruptcy court's opinion should be interpreted to mean that Mr. Wiley lacked the requisite bad faith for judicial estoppel, there was no abuse of discretion. "Asserting inconsistent positions does not trigger the application of judicial estoppel unless 'intentional self-contradiction is . . . used as a means of obtaining unfair advantage.'" *Ryan*, 81 F.3d at 362 (quoting *Scarano*, 203 F.2d at 513). Taking into account the above testimony and the bankruptcy court's credibility determinations, there is no basis to conclude that Mr. Wiley withheld disclosure of the default judgment in bad faith or with intent to play fast and loose with

Like the bankruptcy court, we recognize that Mr. Wiley can pursue a nondischargeability determination even if he believes that the judgment is ultimately uncollectible. In other words, valuation and dischargeability present separate questions — it is not inherently inconsistent for Mr. Wiley to move to except the default judgment from discharge even if he doubts its actual value or collectability. Because Mr. Wiley's positions are not "irreconcilably inconsistent," the bankruptcy court did not abuse its discretion by refusing to apply judicial estoppel. *Montrose*, 243 F.3d at 779.

### B. The Premium Payment

Next, Mr. Olson argues that the portion of the default judgment attributable to the premium payment should not be excepted from discharge under § 523(a)(2)(A).

A central purpose of the Bankruptcy Code is to allow debtors to "enjoy new opportunity in life . . . unhampered by the pressure and discouragement of preexisting debt." *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (internal quotations omitted). However, this "fresh start" policy is limited to the "honest but unfortunate debtor." *Id.* at 286-87. Section 523(a)(2)(A) excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

To prevail under this provision, a plaintiff must show that:

> (1) the debtor obtained money, property or services through a material misrepresentation; (2) the debtor, at the time, knew the representation was false or made with gross recklessness as to its truth; (3) the debtor intended to deceive the creditor; (4) the creditor reasonably relied on the debtor's false representations;

---

the courts. We note also that "[t]he determination of bad faith is a fact intensive determination better left to the discretion of the bankruptcy court." *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007).

and (5) the creditor sustained a loss and damages as a proximate result of the debtor's materially false representations.

*In re Cohen*, 191 B.R. 599, 604 (Bankr. D.N.J. 1996), *aff'd,* 106 F.3d 52 (3d Cir. 1997), *aff'd*, 523 U.S. 213 (1998); *In re Moeller*, No. 09-17417, 2014 WL 1315854, at *5 (Bankr. D.N.J. Mar. 31, 2014); *see also In re Glunk*, 343 B.R. 754, 759 (Bankr. E.D. Pa. 2006).[8] The plaintiff must prove fraud by a preponderance of evidence. *Grogan*, 498 U.S. at 287-88.

Mr. Olson does not dispute that Mr. Wiley has satisfied his burden as to the above elements. *See* DI 4 at 20-21. Rather, he argues that § 523(a)(2)(A) does not extend to the premium payment because *Cohen* concerned statutory punitive damages premised on fraud, which does not apply here, and there is "no nexus" between the premium payment and the "actual fraud" amount of $577,000. *Id.* at 21. Mr. Wiley responds that *Cohen* directly controls, and the premium payment falls within the scope of § 523(a)(2)(A). DI 5 at 11.

In *Cohen*, the Supreme Court faced the question of whether § 523(a)(2)(A) bars the discharge of treble damages awarded on account of a debtor's fraud, or whether the exception only covers the actual value of the "money, property, services, or . . . credit" obtained through fraud. 523 U.S. at 215. The debtor in *Cohen* charged rents above the level permitted by a local rent control ordinance. *Id.* A rent control administrator ordered him to refund $31,382 in excess rent to tenants, but he refused. *Id.* After the debtor filed for Chapter 7 bankruptcy, tenants filed an adversary proceeding arguing that the debt owed for excessive rent was nondischargeable. *Id.* The bankruptcy court found that the debtor had committed "actual fraud" within the meaning of

---

[8] Claims based on actual fraud and false representation require a nearly identical showing. *Compare Moeller*, 2014 WL 1315854, at *5, *with In re Bath*, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010). A false pretenses claim "requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction by the plaintiff." *Bath*, 442 B.R. at 388.

§ 523(a)(2)(A) and awarded the tenants treble damages of approximately $94,000, attorney's fees, and costs under the New Jersey Consumer Fraud Act. *Id.* at 216. It held that *all* obligations arising out of the fraud — including the treble damages award — were exempt from discharge under the fraud exception. *Id.* After examining the plain meaning, legislative history, and policy import of § 523(a)(2)(A), the Third Circuit affirmed. *Id.* at 216-17; *see In re Cohen*, 106 F.3d 52, 58 (3d Cir. 1997).

The Supreme Court reasoned that the "most straightforward reading of § 523(a)(2)(A) is that it prevents discharge of 'any debt' respecting 'money, property, services, or . . . credit' that the debtor has fraudulently obtained." 523 U.S. at 213. In other words, "[o]nce it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." *Id.* at 218. Because the debt for excess rent payment of $31,382 was obtained by fraud, the "full liability traceable to that sum," including treble damages and attorney's fees and costs, fell within the exception. *Id.* at 219. This conclusion comported with the meaning of parallel provisions in § 523(a), as well as the history and general policy of the fraud exception. *Id.* at 219-23. Specifically, the Court noted that legislative amendments evinced no desire to limit the fraud exception to "restitutionary" recovery, as such a limitation would "leave[] the creditor far short of being made whole." *Id.* at 222-23.

Mr. Olson attempts to limit *Cohen's* construction of § 523(a)(2)(A) to statutory punitive damages awarded in an action sounding in fraud. DI 4 at 21; DI 6 at 6. Relying on this premise, he argues that the bankruptcy court, in applying *Cohen*, construed the premium payment as *de facto* punitive damages without any authority to do so. DI 4 at 22.

10

We do not read *Cohen* so narrowly.[9] The Court in *Cohen* did not limit its holding to debts resulting from punitive damages in fraud actions. Rather, the Court repeatedly described the *broad* scope of debt rendered nondischargeable by § 523(a)(2)(A). *See Cohen*, 523 U.S. at 223 ("'*any debt* . . . for money, property, services, or . . . credit, to the extent obtained by' fraud encompasses *any liability* arising from money, property, etc. that is fraudulently obtained, including treble damages, attorney's fees, and *other relief that may exceed the value obtained by the debtor*") (emphasis added). Though the specific issue before the *Cohen* Court involved a debt for punitive damages, the Court's analysis applies with equal force to other types of debts arising from fraud. *See id.* at 221-23.

Furthermore, other courts have applied *Cohen* to debts other than traditional punitive damages for fraud. *See, e.g.*, *Miller v. Lewis*, 391 B.R. 380 (E.D. Tex. 2008), *aff'd* 307 Fed. Appx. 785 (5th Cir. 2008) (holding that a state court judgment for breach of contract and fraud claims was nondischargeable under *Cohen*); *In re Ayesh*, 465 B.R. 443, 449 (Bankr. S.D. Tex. 2011) (applying *Cohen* to a state court award for legal fees, interest, and other costs arising out of a breach of contract claim, not a fraud claim); *In re Nicodemus*, 497 B.R. 852, 859-62 (6th Cir. 2013) (applying *Cohen* to hold that a contempt judgment, while not punitive damages, was nondischargeable under § 523(a)(2)(A)); *cf. In re Fusion Connect, Inc.*, 634 B.R. 22, 30 (S.D.N.Y. 2021) (applying *Cohen's* construction of § 523(a)(2)(A) to an FCC penalty where the United States (creditor) was not among the victims of the debtor's fraud).

Accepting that *Cohen's* construction of § 523(a)(2)(A) applies to the premium payment,

---

[9] Nor do we agree with Mr. Olson's reading of the bankruptcy court's opinion, which did not impose the premium payment as a form of punitive damages. Nonetheless, we address the question of whether *Cohen* applies to the premium payment *de novo*.

we must employ the methodology outlined therein.  Mr. Olson does not dispute that he obtained "money, property, services, or . . . credit" through fraud.  *See Cohen*, 523 U.S. at 218; DI 4 at 21.  He also does not dispute that the portion of the default judgment attributable to the premium payment is a "debt."  *See Cohen*, 523 U.S. at 218 (defining "debt" as a "liability on a claim," a "right to payment," and an "enforceable obligation").  The key question, then, is whether the premium payment is debt "arising from" or "on account of" Mr. Olson's fraud.  *Id.* at 220.  We determine that it is.

The premium payment constituted the anticipated profits that Mr. Olson claimed the parties would receive from the fraudulent CSS deal.  DI 4-1 at 9; DI 2-3 at 34.  The bankruptcy court credited Mr. Wiley's testimony that he would not have made the outstanding CSS payment, or calculated and booked the anticipated profits, if he had known the CSS deal was fictitious.  DI 4-1 at 25.  It also found that Mr. Wiley required the promissory note with the premium payment *because* the CSS deal was delayed (due to it being a sham).  *Id.* at 8; DI 2-3 at 31.  Mr. Wiley lost his home, business, and livelihood in part because the expected profits from the CSS deal never materialized.  DI 4-1 at 26.[10]  The portion of the default judgment attributable to the premium payment is debt "arising from" fraud.[11]  *Cohen*, 523 U.S. at 220.

This conclusion stands even though Mr. Wiley made his last payment on the CSS deal months before the parties negotiated the promissory note, and Mr. Olson never actually received

---

[10] Mr. Olson does not dispute the bankruptcy court's factual findings.

[11] The Ninth Circuit's opinion in *In re Sabban*, 600 F.3d 1219 (9th Cir. 2010), which Mr. Olson cites in reply, is non-controlling and distinguishable.  *See* DI 6 at 9.  In *Sabban*, the Ninth Circuit determined that a state court judgment did not arise out of fraud because the creditor suffered no actual loss as a result of the debtor's fraudulent misrepresentation, and the state court judgment was related to the debtor's lack of license, not fraudulent conduct.  600 F.3d at 1224.

the value of the premium payment. *See* DI 6 at 6-7, 10. *Cohen* makes clear that § 523(a)(2)(A) does not limit a debtor's liability to the value of money, property, or services *actually received* through fraud. 523 U.S. at 219. Similarly, we do not find persuasive Mr. Olson's argument that § 523(a)(2)(A) should not apply because the default judgment proceeding "sounded in contract," not fraud. DI 6 at 10. Such a limitation would leave Mr. Wiley "far short of being made whole" simply because he sued to recover on the promissory note *before* he was aware of Mr. Olson's fraud, and Mr. Olson failed to appear in court. *Cohen*, 523 U.S at 223.[12]

We recognize that the premium payment significantly increases Mr. Olson's nondischargeable debt. But such an outcome is not misaligned with the purpose of the fraud exception. As the Third Circuit has made clear, the "nondischargeability exceptions reflect Congress' belief that debtors *do not* merit a fresh start to the extent that their debts fall within § 523." *In re Braen*, 900 F.2d 621, 625 (3d Cir. 1990).

## IV.   CONCLUSION

For the foregoing reasons, the bankruptcy court did not abuse its discretion by refusing to apply the doctrine of judicial estoppel, and the portion of the default judgment attributable to the premium payment is nondischargeable pursuant to § 523(a)(2)(A). We affirm the decision of the bankruptcy court.

---

[12] The Third Circuit has historically counseled courts to look behind the underlying state court judgment to determine whether the exceptions from discharge should apply. *See In re Johnson*, 323 F.2d 574, 578 (3d Cir. 1963) ("[I]t was . . . necessary . . . for the bankruptcy court to inquire into the nature of the liability which had been reduced to judgment in order to determine whether it falls within the Act, and further to inquire into the circumstances surrounding the creation of the debt or the entry of the judgment.").